THE MANHATTAN LIFE INSURANCE COMPANY, Plaintiff, *v.* GEORGE F.
JOHNSON and Others, Defendants, Impleaded with FREDERICK T.
KELLOGG, Respondent, and WILLIAM C. DEWEY, Appellant.

First Department, November 5, 1906.

**Usury — foreign notes secured by mortgage on lands in this State —
foreign statute as to usury governs — mortgage — surplus proceedings.**

Promissory notes executed in, and to be paid in a foreign State, at a rate of
interest which is not usurious in that State, are governed by the laws thereof
and are valid and enforcible, although the rate of interest would be usurious
here; and a mortgage upon lands in this State given to secure the payment of
such notes is valid and not subject to the defense of usury.

When a deed has been adjudged to be a mortgage by the courts, and on fore-
closure of a prior mortgage an accounting between the real owner and the
mortgagee holding under said deed shows that the former is indebted to the
latter in a sum greater than the surplus on the foreclosure of the prior
mortgage, the owner is not entitled to the surplus.

Equitable division of the costs of the foreclosure of a mortgage on lands, when
different portions are held by different owners, considered.

(Per LAUGHLIN and CLARKE, JJ.): The validity of promissory notes executed
in, and to be paid in a foreign State, where the interest reserved is not usuri-
ous, is to be decided by the law of the State, but the validity of a mortgage
on lands in this State, given to secure said notes, is to be determined by our
own statute.

APPEAL by the defendant, William C. Dewey, from an order of
the Supreme Court, made at the New York Special Term and
entered in the office of the clerk of the county of New York on
the 15th day of August, 1906, overruling exceptions filed to the
report of a referee appointed in surplus money proceedings and
modifying and confirming the report and directing the city cham-
berlain to pay to defendant Frederick T. Kellogg the sum of
$38,547.39, and a further sum to reimburse him for disbursements
and for costs and disbursements.

*Wilbur F. Earp*, for the appellant.

*Arthur S. Luria*, for the respondent.

Order affirmed, with costs, on opinion of referee.

Present — O'BRIEN, P. J., INGRAHAM, LAUGHLIN, CLARKE and
SCOTT, JJ.; LAUGHLIN and CLARKE, JJ., concurring in opinion by
LAUGHLIN, J.

The following is the opinion of the referee:

FREEDMAN, Referee:

In passing upon the claims of the respective claimants I deem it best to consider first of all the question of usury litigated by William C. Dewey and his judgment creditors against Frederick T. Kellogg.

By deed dated May 29, 1902, and recorded on the same day, one Albert Joske conveyed to Kellogg a plot of ground 200 feet square on Alexander avenue, borough of The Bronx, running through from One Hundred and Thirty-second street to the Southern boulevard, formerly One Hundred and Thirty-third street, subject to a first mortgage of $110,000 — which is the mortgage foreclosed in this action — and a second mortgage of $25,000, then liens on the premises.

By deed dated October 31, 1902, and recorded November 7, 1902, Frederick T. Kellogg conveyed to the Kroeger Piano Company not quite one-half of the said premises, subject, however, among other things, to $60,000 of the principal, with the interest to accrue thereon, of a first mortgage of $110,000, held by the Manhattan Life Insurance Company of New York, and to $15,000 of the principal, with the interest to accrue thereon, of another and second mortgage for $25,000, then a lien on said premises and held by George F. Johnson.

For convenience sake I shall hereafter refer to the said premises so acquired by the Kroeger Piano Company as parcel No. 2, and the premises of which the title remained in Kellogg as parcel No. 1.

The claim of usury advanced by Dewey and his judgment creditors is that, as between him and them and Kellogg, the deed by Joske to Kellogg was intended to be and is to be treated as a mortgage; that such mortgage was and is usurious and void on the ground that it was given and is held as security for the payment of notes given upon an usurious agreement, and that for that reason the surplus coming to parcel No. 1 should be paid to him (Dewey) after payment of judgments against him.

The evidence introduced on this point shows the following state of facts:

Kellogg at the outset, at Springfield, Mass., advanced to Dewey the sum of $25,000 at six per cent interest, and without security,

repayable at Springfield.   Dewey thereafter wanted $25,000 more, and on one occasion Dewey offered him a bonus of $10,000, and on another occasion Kellogg said that in such case he wanted a bonus of $10,000.   But nothing came of it because Kellogg finally declined to advance any more money.   Dewey thereafter, at Kellogg's suggestion, applied to Mr. Morse, president of the Second National Bank of Springfield, and also saw a Mr. Pratt, and, after some negotiations, it was agreed that the following loans should be made to Dewey, viz.: By the Second National Bank, $10,000; by Morse individually, $7,000, of which $2,000 should be a bonus; by Mr. Pratt, $7,000, of which $2,000 should be a bonus; and that Kellogg should allow his $25,000 to remain in the pool, for which he should receive a bonus of $10,000.   It was further agreed that as security for the repayment of said sums the deed presently to be referred to should be given by Dewey to Kellogg, who was to hold the title for all parties concerned.

On February 1, 1902, Dewey in Springfield gave his notes dated on said day in Springfield and payable in Springfield to the Second National Bank for $10,000, to Morse $7,000, to Pratt $7,000 and to Kellogg $23,000 (of which a note of $10,000 represented a bonus), in addition to which Kellogg then held the joint note of Dewey and his wife, also made, dated and payable in Springfield, for $12,000.   At the time of giving said notes on the day named Dewey also delivered in Springfield to Kellogg a certain deed of property then owned by him on Varick street, in the city of New York, and at the same time, at the office of Kellogg in Springfield, an agreement was made in writing to the effect that said Varick street property was to be redeeded to Dewey upon the payment by him of certain notes to the amount of $45,000, with interest (which notes represented the moneys actually loaned and received), and the further payment of $14,000, the amount of certain other notes, provided a certain building proposed by Dewey to be erected, should be built and completed by him or sold in an incompleted condition by him.   This building, it may be stated here, was subsequently built and caused to be completed by Dewey.

At all these times, Morse, Pratt, Kellogg and Dewey were residents of Springfield, Mass.

Shortly thereafter Dewey proposed a substitution of the Bronx

First Department, November, 1906.    [Vol. 115.

property in place of the Varick street property, and this resulted in the delivery at Springfield to Kellogg of the deed by Albert Joske to Kellogg hereinbefore referred to, bearing date May 29, 1902, and being the same premises which were sold pursuant to the judgment of foreclosure in this action, and in a conveyance of the Varick street property by Kellogg to Joske.

The evidence further shows that of the $59,000 of notes Dewey actually paid to the holders of the respective notes other than Kellogg one note of $5,000 and took up one bonus note of $2,000 by payment of $1,000 in cash to Mr. Pratt, and took up one bonus note of $2,000 held by Morse by release of his equity in a piece of property in Seventy-sixth street, New York, held as security for a different loan by Morse of $5,000 and sold to him for the amount of said loan and cancellation of said bonus note.

Upon these facts it is clear that the contract between Dewey and Kellogg which culminated in the delivery to Kellogg of the deed now to be treated as a mortgage, which treatment is conceded by Kellogg to be correct as between Dewey and his creditors and himself, was made and was to be performed in Massachusetts. The general rule applicable to such a contract is that the law of the place where the contract is made, and not that where the action is brought, is to be considered in expounding and enforcing the contract.

This has been well stated in the very recent case of *Trustees of Brookhaven* v. *Smith* (98 App. Div. 212), decided by the Appellate Division, second department, in November, 1904. Mr. Justice WOODWARD in writing the unanimous opinion of the court states the underlying principle as follows: "It is well settled in our jurisprudence that the laws which subsist at the time and place of making a contract, and where it is to be performed, enter into and form a part of it, as if they were expressly referred to and incorporated in its terms, and that this principle embraces alike those which affect its validity, construction, discharge and enforcement." Citing numerous United States Supreme Court authorities.

To the same effect is the case of *Union National Bank* v. *Chapman* (169 N. Y. 538), in which it was held that the rule covered all matters bearing upon the execution, interpretation and validity of contracts, including the capacity of the parties to contract.

The rule, as stated, has always been enforced as to contracts claimed to be usurious.

In *Curtis* v. *Leavitt* (15 N. Y. 9, 296) the Court of Appeals concluded that a contract under which certain bonds issued by a New York party were negotiated and pledged in England, was an English contract and that the question of usury had to be determined by the then existing laws of England, and, furthermore, that a loan, nominally, of $250,000 procured from Philadelphia banks, was a Pennsylvania contract, and that, although it may have been usurious, by the laws of that State, it was inoperative only for the excess of interest over six per cent, the lawful interest.

In *Willis* v. *Cameron* (12 Abb. Pr. 245, decided by the General Term of the New York Common Pleas in March, 1861) the action was upon a promissory note and the defense was that the note was made in violation of the usury laws of a foreign State. By those laws the contract was declared not to be avoided, but, by way of penalty for a violation, a forfeiture of three times the excess of interest reserved, was to be allowed in an action on the contract; or, if paid, to be recovered back. It was held that the defendant could not, in this State, avail himself of the penalty even by way of defense.

In *Wayne County Savings Bank* v. *Low* (81 N. Y. 566, decided Sept. 1880), the head note correctly states the following proposition: " A party residing in one State who goes into another State and there makes an agreement with a citizen of that State for a loan, lawful by its laws, but usurious under the laws of the borrower's State, cannot render his obligation void by making it payable in his own State. Nor does the fact that the obligation is executed in the latter State, and sent to the lender by mail, require that it should be governed by the usury laws of the State where it was signed."

In *Western Transportation & Coal Co.* v. *Kilderhouse* (87 N. Y. 430, decided Jan. 1882) the action was upon renewal notes, and one of the defenses was usury, and is was held that, inasmuch as the contract for forbearance was a Michigan one and was valid under the laws of that State, it was valid and enforcible here. In coming to that conclusion, the court unanimously reaffirmed the rule as stated and enforced in *Wayne County Savings Bank* v. *Low* (*supra*).

Moreover, in the case of *Cutler* v. *Wright* (22 N. Y. 472) the

Court of Appeals unanimously holds, although differing on other points, that a defendant seeking to avail himself of the defense of usury in an action upon a note dated and made payable in a foreign State, is bound to allege and prove the foreign law which renders the contract usurious, and that there is no presumption in such a case that the foreign law agrees with our own. Continuing, the court says : "It is not set up in the answer that by the laws of Florida, this contract was usurious, and, therefore, void. The allegation that it was usurious and void by the laws of the State of New York was an immaterial averment, and in no sense tended to show the usurious character of the transaction by the laws of Florida."

This was referred to in *Harris* v. *White* (81 N. Y. 532) which arose under a statute against racing, and in which the court says (p. 544): "As a general rule, courts of one State, in the absence of proof and allegations otherwise, will presume that the laws of another State are like those of their own State. It is doubted, however, whether this presumption will be made of statute law. (*McCulloch* v. *Norwood*, 58 N. Y. 567; *Wilcox Co.* v. *Green*,* 72 id. 17.) It will not be made of statutes imposing a penalty or forfeiture. (*Cutler* v. *Wright, supra.* And it has been declared that a court cannot take notice judicially of any laws of other States not according to the common law. (*Holmes* v. *Broughton*, 10 Wend. 75.)"

There is no proof on the part of the claimant Dewey that the contract was illegal at the place where it was made and was to be executed, and, as a matter of fact and law, the statutes of Massachusetts do not make a contract like the one now under consideration, though tainted with usury, void as to the principal sum.

The claim of Dewey and his creditors is, therefore, limited to the ground that while the contract was made and was to be performed in Massachusetts, was lawful there, and was made between residents of Massachusetts, the penal usury law of New York applies because as security for the fulfillment of the contract a deed was delivered in Massachusetts of New York property. Unfortunately for Dewey, the authorities bearing upon the real question presented by that claim are also against him.

* *Wilcox Silver Plate Co.* v. *Green.*— [REP.

*De Wolf* v. *Johnson* (10 Wheat. [U. S.] 367) is directly in point. In that case the question arose whether the *lex loci* of a certain original contract made in 1815 was Rhode Island or Kentucky. By the usury laws of the latter the contract and all the securities given for it were void, both for principal and interest. By the laws of the former, although it was prohibited to take more than six per cent interest, and a penalty was imposed for the offense, the contract was not rendered void, certainly not for the principal sum. JOHNSON, J., in delivering the opinion of the court, said: "With regard to the locality of the contract of 1815, we have no doubt that it must be governed by the law of Rhode Island. The proof is positive that it was entered into there, and there is nothing that can raise a question but the circumstance of its making a part of the contract that it should be secured by conveyances of Kentucky land. But the point is established that the mere taking of foreign security does not alter the locality of the contract with regard to the legal interest. Taking foreign security does not necessarily draw after it the consequence that the contract is to be fulfilled where the security is taken. The legal fulfillment of a contract of loan on the part of the borrower, is repayment of the money, and the security given is but the means of securing what he has contracted for, which, in the eye of the law, is to pay where he borrows, unless another place of payment be expressly designated by the contract. No tender would have been effectual to discharge the mortgagee unless made in Rhode Island. On a bill to redeem, a court of equity would not have listened to the idea of calling the mortgagee to Kentucky in order to receive a tender."

So in *Caesar* v. *Capell* (83 Fed. Rep. 403), where a citizen of Tennessee and a corporation of Missouri had entered into a contract for a loan of money and its repayment, which would have been invalid under the laws of Tennessee, but valid under those of Missouri, and by its terms had made it a Missouri contract and to be there performed, it was held that it would be presumed that they intended to be governed by the laws of that State, and that said contract was not rendered a Tennessee contract by the fact that the debt was secured by mortgage on land in Tennessee.

In *Williams* v. *Fitzhugh* (37 N. Y. 444) the loans were made and were payable in New York, and the contract to secure the

loans by an Ohio mortgage was made in this State. Some of the loans were usurious and void under the laws of New York. The action was brought by the borrower to have six notes declared void and the mortgage discharged or its enforcement enjoined. It was held that the location of the mortgaged premises in another State formed no impediment to the jurisdiction of the New York court, but that so far as the mortgage was concerned, the plaintiff having applied to a court of equity for relief, should have been required to pay the amount of the loans not tainted with usury.

*Cope* v. *Wheeler* (41 N. Y. 303) was an action on a loan made and payable in New York by residents of New York, secured by a bond and mortgage on property in Wisconsin. The loan was usurious under the laws of New York, and it was held that it was a New York contract and must be decided by the laws of New York. In the opinion of Judge WOODRUFF (pp. 312, 313) he states: " Nothing is, I apprehend, better settled than that the mere fact that collateral security for the payment of a debt contracted here and payable here is real property situated in another State, does not change the place by the laws of which the validity of the contract is to be tested."

Dewey and his creditors, however, cite and strenuously urge the decision in *Chapman* v. *Robertson* (6 Paige, 627) as applicable to the present case.

The head note of that case is as follows: " Where R., a resident of the State of New York, applied to C. at his residence in England for a loan of money upon the security of a bond and a mortgage upon lands in New York, at the legal rate of interest in that State, and it was there agreed that upon the return of R. to New York he should execute his bond and mortgage and have the mortgage duly recorded in the county where the lands were situated, and that upon the receipt of the bond and mortgage by C. in England he should deposit the money loaned with the bankers of R. in London for his use, and the bond and mortgage were executed and the money received accordingly; *Held,* that the mortgage was a valid security for the loan according to the laws of New York, and that upon a bill filed there to foreclose the mortgage, R. could not set up the usury law of England as a defense to the suit."

The opinion discusses somewhat at length the general principles

of the *lex loci rei sitæ* applicable to purely personal contracts as well as to contracts concerning real property, and towards the end seems to state the real ground of the conclusion reached upon the question presented by the case as follows: " It was a contract partly made in this State and partly in England. And being actually made in reference to our laws, and to the rate of interest allowed here, it must be governed by them in the construction and effect of the contract as to its validity," etc. (p. 634).

If the facts had clearly been shown to have been as thus stated, the correctness of the decision could not be impugned because it only carried into effect the intention of the parties in making the contract. Perhaps there was sufficient evidence to that effect outside of the instruments executed, and the difficulty simply is that the case was insufficiently reported. At any rate, the fact is that while the case in numerous instances has been cited and followed and approved upon some general well-settled proposition or other discussed in the opinion (and the many citations to that effect by the learned counsel for Dewey and his judgment creditors are all of that character) it has been doubted and disapproved in cases which directly involved the question of the usury law of the places where the contract was made and was to be performed.

It was doubted in the leading case of *Curtis* v. *Leavitt* (15 N. Y. 9, 88).

It was doubted in *Dickinson* v. *Edwards* (77 N. Y. 573), in which FOLGER, J., delivering the opinion of the court, says concerning it (pp. 585, 586): " *Chapman* v. *Robertson* (6 Paige, 627) is a case often cited and relied upon; but it does not impugn the general rule, that the validity of a purely personal contract is to be tried by the law of the place of its performance. * * * The opinion in that case has not escaped criticism : ' If viewed as the Chancellor interpreted the case, it is perhaps irreconcilable with other cases and with general principles;' (Story on Conflict of Laws, § 293c); 'it appears to me that the case was correctly decided, but * * * upon principles and expositions to which I cannot assent, and which appear to me inconsistent with the general reasoning of the authorities' (id., note 3*; see, also *Curtis* v. *Leavitt*, 15 N. Y. 88, 228)."

---

*See Story on Conflict of Laws (8th ed.), 402, note 1.— REP.

And *Chapman* v. *Robertson* was disapproved in *Cope* v. *Alden* (53 Barb. 350). In that case it was held that an agreement for the loan of money, made and consummated in this State by residents thereof, by which the borrower is to give a bond accompanied by a mortgage upon lands in Wisconsin, no place of payment being specified, is governed by the usury laws of New York and not by those of Wisconsin. In speaking of the case of *Chapman* v. *Robertson* (6 Paige, 627) MASON, J., in delivering the unanimous opinion of the court, says (p. 354): " Whatever may be thought of this case — and its soundness has been questioned by Chancellor Kent in his Commentaries* and by Judge STORY† — it decides nothing in the case before us. It is evident from the opinion of Chancellor WALWORTH, in the case, that he excepts this case, and indeed seems to hold this contract usurious," etc.

And concerning the case of *De Wolf* v. *Johnson* (10 Wheat. 383) MASON, J., says that by it " it is expressly decided that the *lex loci contractus* must govern in a question of usury, although by the terms of the agreement the debt was to be secured by a mortgage on real property in another State. The case is cited with approbation in the case of *Andrews* v. *Pond* (13 Peters, 78). The case of *Newman* v. *Kerhaw* (10 Wis. R. 333) is directly in point and decides the very question presented in this case," etc.

The same case came before the Court of Appeals under the title of *Cope* v. *Wheeler* (41 N. Y. 303), and in his opinion JAMES, J., says: " This question was very thoroughly examined in the Supreme Court on a former appeal in this same cause, and an opinion written on that occasion by Justice MASON gave the true exposition of the law on this question, and may well be adopted as the opinion of this court on that question. (53 Barb. 350)."

And WOODRUFF, J., in a concurring opinion, says (at p. 313): " The contract is said to be withdrawn from the operation of our usury laws, because as claimed, it was made with reference to the laws of Wisconsin, where it is lawful to reserve interest at the rate of twelve per cent per annum.

" No doubt it is possible for parties in this State to make a contract of loan or advance with such reference to a foreign law, that

---

*See 2 Kent Com. (14th ed.) 461, note a.— [REP.        † *Supra.*— [REP.

the latter will govern its construction and legal effect. But that rule does not import that parties, by a mere mental operation, can import the law of another State into this for the purpose of altering the character of a loan made here, and to be here returned without any undertaking or duty to use the money anywhere else, or any understanding that in respect to the use or repayment of the money the loan shall differ from any other."

I think it has now been sufficiently shown that the claim of usury in this case is untenable, although under the statutes of New York not only the contract, pursuant to which both deeds were given, but the deeds themselves would have been void if the contract had been made here and was to be performed here.

Indeed, Dewey's case in this respect is not near as strong as the case of the borrower was in *Chapman* v. *Robertson.* In the latter case the borrower resided where the real property was situated; in the present Dewey is shown to have been and to be a resident of the place where the contract was made and was to be performed; in the latter the bond specified no place for payment; in the present the notes were expressly made payable at a certain bank in Springfield, Mass.; in the latter the contract was deemed to have been made with reference to and in contemplation of the laws of New York, where the collateral security was valid, though void in England, while in the present it would be preposterous, in the absence of extrinsic proof upon the subject, to suppose for a moment that the shrewd and sharp men dealing with one another at arms' length intended that the validity of the collateral should be judged by New York law, under which it would have been invalid, instead of by the law of Massachusetts, under which it was valid, at least as far as the principal sum. And, finally, it should be borne in mind that the collateral security in this case was a deed absolute on its face, under which Kellogg went into possession and received the rents and profits of the premises; that it was not necessary for him to come to New York in the capacity of a mortgagee out of possession and bring foreclosure, and that the surplus in this case stands as a substitute *pro tanto* for the rights he enjoyed in Massachusetts under his deed, where Dewey would have to make a tender of the amount due in order to entitle himself to a reconveyance.

The plea of usury not being available, it remains to be seen

whether the part of the surplus coming to Kellogg is greater than the aggregate amount of the indebtedness of Dewey upon the claims held and represented by Kellogg. As already stated, Dewey, by making certain payments to parties other than Kellogg, reduced the amount of his obligations upon the notes secured by the deed in question to $50,000. These payments were made by Dewey for specific purposes, and not through Kellogg as a medium. No question can, therefore, arise that they should be applied differently upon his general indebtedness. If, then, we even leave out of consideration the $10,000 note given to Kellogg as a bonus, especially as Kellogg has waived his claim upon it, there still remains a balance of $40,000, of which $25,000 were originally lent by Kellogg to Dewey in a manner not tainted with usury in any way. To this must be added accumulated interest. If we consider only the interest on the notes held by Kellogg (exclusive of the $10,000 note for a bonus), the amount stands as follows:

| | |
|---|---:|
| Notes due Kellogg | $25,000 00 |
| Interest thereon to April 1, 1906 | 4,125 00 |
| Principal of note due Mr. Morse | 5,000 00 |
| Principal of note due the Second National Bank | 10,000 00 |
| Total | $44,125 00 |

Kellogg admits that he has received from rents and insurance rebates, etc., from parcel No. 1 and is chargeable on that account with $10,443.96.

On the other hand, Dewey conceded the correctness of certain charges and Kellogg proved the payment by him of others, making a total of $6,553.96.

Deducting this sum from total collections of $10,443.96 leases Kellogg accountable for $3,890, which has been credited Dewey against interest, in pursuance to an agreement between the parties, as testified by Dewey. Deducting this amount from the total indebtedness above shown of $44,125, leaves a balance still due Kellogg, on behalf of himself, Morse and the Second National Bank, of $40,235.

As this sum is much larger than the total surplus coming to parcel No. 1, it was not deemed necessary to establish in this proceed-

ing the correctness of other payments claimed to have been made by Kellogg out of the rents.

The result, therefore, is that neither Dewey nor his judgment creditors are entitled to any portion of the surplus.

The remaining questions relate to the apportionment of the surplus and the costs of the foreclosure suit between Kellogg and the Kroeger Piano Company and the amount which each party should be charged with as his proportionate share of the costs and expenses of the reference. Most of these questions must, as has been conceded, be determined upon equitable considerations, and to a correct determination of them it is necessary to consider a number of agreements and transactions not yet referred to.

It appears that the deed by Kellogg to the Kroeger Piano Company, hereinbefore referred to, was executed and delivered at the request of Dewey, who by an agreement dated October 15, 1905, had contracted to sell parcel No. 2 to the Kroeger Piano Company for the sum of $100,000, subject to a mortgage or mortgages not exceeding $75,000. In consequence of the inability of Dewey to fully perform this agreement, a further agreement was made between him and the Kroeger Piano Company bearing even date with the deed from Kellogg, to the effect that by the acceptance of said deed, subject as therein stated, the Kroeger Piano Company paid and discharged $75,000 of the $100,000 which was the total agreed purchase price, and that the balance of $25,000 should be paid only upon certain conditions and in a certain manner expressly set forth in said further agreement. One of the conditions was in effect that Dewey should, in one of two ways proposed, so arrange the existing mortgages on parcel No. 2 that it should be held only as security for the sum of $75,000; that then, but not until then, the sum of $25,000 should be liquidated in a certain way; and that, if there should be a foreclosure of either or both of the then existing mortgages, the Kroeger Piano Company might take steps and measures to protect itself and that any and every cost, expense and outlay incidental in any way to the accomplishment of that end, and all loss and damage to said company, by reason of such proceedings and sales, should be paid out of said $25,000.

Johnson having thereafter begun a suit to foreclose his mortgage for $25,000, upon the whole of the premises, an agreement was on

December 31, 1902, duly made by and between said Johnson, the Kroeger Piano Company, Kellogg, Dewey and Christopher B. Garritson, president of said piano company, by which in various ways provision was made for the settlement and discontinuance of said suit and the release of parcel No. 2 from the lien of said mortgage. Besides the costs and disbursements and accrued interest there was paid to Johnson the sum of $20,000 on account of the principal, of which the Kroeger Piano Company furnished $15,000 in cash and the balance of which was furnished by Kellogg and Dewey. For the payment of the remaining $5,000 the Kroeger Piano Company, Garritson and Dewey gave their corporate and individual joint and several promissory note payable June 30, 1903, and until payment of such note Johnson's mortgage was to remain a lien upon parcel No. 1 to the extent of $5,000 and interest from December 31, 1902. The agreement also provided that, as between the parties to it, parcel No. 1 should be deemed to be security for $50,000 of the first mortgage of $110,000, and that Johnson's mortgage to the extent of $5,000 should be deemed subject and subordinate to said $50,000 of said first mortgage.

The performance of the conditions of the agreement of December 31, 1902, materially changed the situation created by the agreement of October 31, 1902, and further notes having been given by the Kroeger Piano Company to Dewey for the balance due on account of the sum of $25,000 which constituted part of the purchase price, a further agreement was drawn up dated January 17, 1903, to define with precision the respective remaining rights and obligations of the Kroeger Piano Company and of Dewey and Kellogg.

This last-mentioned agreement referred to the prior agreements of October 31 and December 31, 1902, and the performances thereunder, and then stated that of the $20,000 in cash paid to Johnson as recited in the agreement of December 31, 1902, $15,000 was furnished by the Kroeger Piano Company and the balance by Dewey; that by the payment of the Johnson mortgage parcel No. 2 was relieved from the lien of $15,000 of the second mortgage subject to which the said parcel was conveyed by Kellogg, and that, therefore, it remained for the Kroeger Piano Company to pay said $15,000 in order to complete the full sum of $100,000 which was the actual consideration of the deed to it as between it and Dewey.

Provision was then made that Dewey, at his own expense, should, by and with the consent of the holder of the first mortgage, procure an apportionment of said mortgage so that but $60,000 should remain a lien upon parcel No. 2, or in the alternative procure the cancellation of said mortgage as to said parcel and, the substitution of a new mortgage in its stead for $60,000. Upon the successful performance by Dewey of this obligation, the Kroeger Piano Company was to execute and deliver to him its bond, to be secured by a second mortgage upon parcel No. 2, conditioned for the payment of the $15,000 in certain installments.

By paragraph 9 of the same agreement it was further provided that if, for any cause (not the fault of the Kroeger Piano Company) there should be a foreclosure of the mortgage for $110,000, the said company might take such steps and measures as by it might be thought proper and expedient to protect itself and its interests in such foreclosure proceedings and the sale or sales thereunder, and that any and every act, expense and outlay incidental in any way to the accomplishment of that end, and all loss and damage to said company by reason of such proceedings and sales should be deducted from said $15,000, and that only the remainder, if any, should be payable as aforesaid.

And by paragraph 12 of the same agreement it was provided as follows: " The said Kellogg hereby ratifies and confirms all the transactions and agreements relative to the said property, and the sale thereof to said corporation, or in any way arising out of the same, and does hereby express his acquiescence in and consent to the terms and provisions of this agreement." .

This agreement was signed and acknowledged by Dewey and Kellogg and appears to have been delivered between them, for on this reference it was produced by Dewey on the call of the Kroeger Company. It appears not to have been executed by said company, but, as no point was made on account thereof, I shall assume that it was.

Thereafter, by an instrument dated April 29, 1905, and subsequent to the commencement in March, 1905, of the foreclosure action by the Manhattan Life Insurance Company, Mr. Garritson took from Dewey an assignment of all right, title, interest and demand which Dewey ever had, or might at any time thereafter

have, arising from, under and out of any and all agreements in which the Kroeger Piano Company and he had participated as parties, either by themselves or with others, bearing upon or in any way relating to parcel No. 2, together with all moneys accrued or to accrue from said company to him by reason of any stipulations in said agreements contained.

Upon this state of facts it is clear that as between Dewey, Kellogg and the Kroeger Piano Company it was expressly agreed that under the mortgage of $110,000 foreclosed in this action, parcel No. 1 should be held as security to the extent of $50,000, and parcel No. 2 to the extent of $60,000.

But I fail to see how parcel No. 1 can be charged with the total amount of the costs and expenses of said foreclosure. The only agreement remaining in force as to said costs and expenses in which Kellogg joined was the agreement of January 17, 1903, by which it was provided that said costs and expenses should be paid by Dewey and charged against a specific fund of $15,000 which was to be paid to Dewey and not to Kellogg, as a part of the purchase price of parcel No. 2. This is all that, upon the state of facts then existing, Kellogg assented to. Even if it be held, therefore, that not only as between him and Dewey, but also as between him and the Kroeger Piano Company his title is merely that of a mortgagee in possession, it needs no authorities to substantiate the proposition that without the consent of the mortgagee Dewey could not create a subsequent lien on the property to the prejudice of the mortgagee's rights therein. And inasmuch as Kellogg's claim against Dewey is larger than the total amount of the surplus coming to parcel No. 1, neither the whole nor any part of the costs and expenses of the foreclosure can be assessed upon Kellogg except upon equitable considerations.

Under all the circumstances disclosed, the most equitable disposition that can be made is to apportion the amount of such costs and expenses between the two owners of record of the parcels sold under the judgment in the same proportions as the said parcels are chargeable under the mortgage, that is to say, parcel No. 1 is chargeable with five-elevenths of said costs and expenses, and parcel No. 2 with six-elevenths of said costs and expenses. They are shown by the referee's report to be :

| | | |
|---|---|---|
| Referee's fees and expenses...................... .... | $282 | 41 |
| Plaintiff's costs and allowance................ ....... | 412 | 19 |
| Total...... .......... ..................... | $694 | 60 |
| Making a change against parcel No. 1 of..... .......... | $315 | 73 |
| And against parcel No 2 of...................... .... | 378 | 87 |

The only remaining question in dispute relates to the costs and expenses of the reference in the surplus-money proceedings. These, it is conceded, should also be equitably apportioned. Upon this branch of the case the material facts are that the claims presented by Kellogg, to the extent that they were disputed, were decided in his favor. So far as the Kroeger Piano Company is concerned it put forward first a claim to the entire surplus, and, when defeated as to that, a claim that parcel No. 1 should be charged with the entire costs and expenses of foreclosure, and in that was also unsuccessful. Both claims required the taking of much testimony, full consideration of the points submitted in extensive briefs and the rendition of elaborate opinions thereon. And Dewey litigated not only the question of usury and the extent of Kellogg's claim for moneys loaned, but also assisted the Kroeger Piano Company in its attempt to saddle the entire costs and expenses of the foreclosure upon parcel No. 1. In both instances he was wholly defeated. His judgment creditors stood behind him, but their participation in the reference did not materially increase the labor and expense attached to it. Upon full consideration I am of the opinion that the most equitable disposition that can be made is to apportion the amount of the referee's fees and expenses in such a way as to make five-elevenths chargeable against parcel No. 1 and six-elevenths against parcel No. 2. Upon this reference a personal judgment against Dewey for the part charged against parcel No. 1 cannot be given in favor of Kellogg, and he should, therefore, be left to make a motion for such relief in conjunction with his motion for the confirmation of the report, if so advised.

The final result is that out of the surplus aforesaid there should be paid to Kellogg the sum of $38,574.24, with such interest thereon as it may have earned, if any, and the remainder of the surplus, with interest, if any, to the Kroeger Piano Company, less

the sum of $370.50 assessed upon parcel No. 2 for its share in the costs and expenses of this reference.

LAUGHLIN, J. (concurring):

The action was brought to foreclose a mortgage for $110,000 executed by George F. Johnson, who then owned the premises. One Albert Joske subsequently became the owner of the premises and at the instance of appellant Dewey he conveyed the same to defendant Kellogg as security for money loaned by Kellogg to Dewey in Massachusetts and payable there, but at a rate of interest which would make the loan usurious and void under the laws of New York.

After defendant Kellogg obtained the legal title and before the foreclosure action was commenced he conveyed part of the premises to the defendant Kroeger Piano Company. The decree directed the sale of that part of the premises, the title to which remained in Kellogg, designated as parcel No. 1 first. The sale resulted in a surplus. The referee found that parcel No. 1 was entitled to $38,547.39 of the surplus, and parcel No. 2 to $1,752.20 thereof. There is no controversy over the division of the surplus between the respective parcels, but both the appellant Dewey and the defendant Kellogg claim that part of the surplus arising on the sale of parcel No. 1. At the time the foreclosure action was commenced an action brought by judgment creditors of Dewey against Kellogg, Dewey and others to have the deed to Kellogg declared a mortgage was pending, and after the sale, but before the surplus-money proceedings were instituted, judgment had been duly entered in that action declaring that the deed to Kellogg "was as between Kellogg and Dewey a mortgage, and that Dewey was the owner of Parcel No. 1."

In the surplus-money proceedings Kellogg claimed the fund not by virtue of ownership of the title, but by virtue of the lien of the judgment in effect declaring his deed a mortgage. Dewey contested this claim on the part of Kellogg upon the ground that he was the owner of parcel No. 1 and that the loan to Kellogg to secure which he received the deed was usurious, and that, therefore, the conveyance to him was void under our statute, which declares, among other things, that "all * * * conveyances * * * whereupon or whereby there shall be reserved or taken, or secured

or agreed to be reserved or taken, any greater sum or greater value, for the loan or forbearance of any money, goods or other things in action, than is above prescribed, shall be void." (1 R. S. 771, § 1, as amd. by Laws of 1879, chap. 538; Id. 772, § 5, as amd. by Laws of 1837, chap. 430.)

I agree with the learned referee that the *validity* of the *notes* to secure which the mortgage was given is governed by the law of Massachusetts, and that being valid, their payment could be enforced here; but I am of opinion that the validity of the deed as *security* for the indebtedness is to be determined by our statute. *On this point* the authority of *Chapman.* v. *Robertson* (6 Paige, 627) has not, so far as I have been able to discover, been overruled, criticised or questioned. (See, also, *McGoon* v. *Scales,* 9 Wall. 23; *Boyce* v. *City of St. Louis,* 29 Barb. 650; *Goddard* v. *Sawyer,* 9 Allen [Mass.], 78.)

The decree establishing that the deed was given as security for the payment of money and is in fact a mortgage, is not contained in the record, nor are the pleadings in that action in the record before us. It appears that both claimants to the fund were parties to that action, and are, therefore, bound by the judgment. Probably the *amount* for which it was decreed that the deed was given as security was not involved in that action, but it may well be that the deed was held to be *valid* as security for some indebtedness, and upon this record it cannot be said that it was not so held. It may fairly be inferred that the nature and validity of the instrument was adjudicated in that action. The record shows that Kellogg stands upon the judgment therein. In surplus-money proceedings there are no pleadings to embarrass claimants, and the rights of a claimant must be determined on the entire record. I cannot, upon this record, say that Dewey is not precluded by the judgment from questioning the validity of the deed as security, and, therefore, I concur for affirmance; but if the record fairly presented the question as to whether a mortgage upon real estate in New York could be upheld *as security* for a loan made elsewhere, at a rate of interest which would be usurious here, I would be disposed to answer it in the negative.

CLARKE, J., concurred.