Max Thuna, Plaintiff, v. Michael J. Wolf, Defendant.

City Court of New York, August 9, 1927.

**Bills and notes — validity — action to recover on check executed in Florida to cover loss sustained in private poker game — check would be enforcible in Florida — public policy does not demand that courts of this State refuse to enforce check.**

The holder of a check executed and delivered in the State of Florida to cover a loss suffered by the defendant in a private poker game may be enforced in the courts of this State since it is an enforcible contract in the State of Florida. The public policy of this State does not demand that the courts of this State shall refuse to enforce the check in question simply because a similar contract made in this State could not be enforced.

Action to recover on check given in State of Florida for gambling debt.

*Charles Stein*, for the plaintiff.

*Henry E. Coleman*, for the defendant.

Evans, J. The complaint is on a check executed and delivered in the State of Florida. The defense is that the consideration for the check was a loss suffered in a game of cards commonly known as poker. The parties to the suit are residents of this State, and indulged in this game of poker during a winter vacation at a Florida resort. A contract based upon a game of poker for money, in this State, is made void by the statute law. In Florida, where this game and consequent loss to the defendant took place, we must presume that such a contract was not prohibited by statute, because the defense and evidence are silent as to the statute law of Florida on the subject. (*Harris* v. *White*, 81 N. Y. 532.) The case was tried before a jury, to whom the sole question at issue, as to whether the origin of the check resulted from a game of poker, was submitted, and who found that the check was given for a gambling debt, as claimed by defendant. The question is whether a gambling debt incurred in another State, evidenced by a check made in such State, where such a contract is not by statute void, may be enforced in our courts.

The ban of the common law did not fall on sociable card playing for stakes; and some wagers were enforcible in the courts. What the common law abhorred was gambling houses and resorts and the profession of the common gambler. (*People* v. *Stedeker,* 175 N. Y. 57; Whart. Crim. Law, § 2446.)

Our statute under the latest amendment makes the common gambler a misdemeanant. (Penal Law, § 970.) It aims at the suppression of gambling apparatus, gaming and betting establishments (Penal Law, § 973); places for games of policy (Id. §§ 974–976). Gambling instrumentalities may be seized and destroyed. (Penal Law, §§ 977–979.) Persuading visits to gambling places is punishable as a misdemeanor. (Penal Law, § 980.) Commanders, or hirers, or owners of vessels, who permit gambling thereon, are punishable by fine and civil penalty. (Penal Law, § 981.) Slot machines, as gambling devices, are prohibited. (Penal Law, §§ 982–985.) Poolselling, bookmaking, bets and wagers when made in such a way as to indicate the work of a professional or common gambler are prohibited. (Penal Law, § 986.) All forms of racing for a stake are prohibited. (Penal Law, § 987.) Cheating at gambling is made a misdemeanor. (Penal Law, § 988.) Violations of some of the sections of this statute are misdemeanors or punishable by civil penalty, and no more. Civil penalties and forfeitures are prescribed for exacting payment of money won in gambling (Penal Law, § 989), and for winning or losing sums over twenty-five dollars (Id. § 990). None of the foregoing sections have any extraterritorial force, outside of the State, of course. (*Zeltner* v. *Irwin,* 25 App. Div. 228.) But when we come to the sections of the Penal Law involved at bar (§§ 991, 992), no criminal punishment of any kind is prescribed. They read: " § 991. Illegal wagers, bets and stakes. All wagers, bets or stakes, made to depend upon any race, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event whatever, shall be unlawful." " § 992. Contracts on account of money or property wagered, bet or staked are void. All contracts for or on account of any money or property, or thing in action wagered, bet or staked, as provided in the preceding section, shall be void."

The balance of article 88 of the Penal Law (§§ 993–997) has to do with the enforcement of civil and criminal penalties and remedies relating to article 88, and has no bearing here.

The intent and scope of this statute is to ban all public forms of gambling and to suppress the professional or common gambler.

Nowhere, that I can find, is the game of poker for money, when played as a pastime, in private, and without the connivance of the

professional gambler, forbidden by any criminal statute. It is true that civil contracts based on gambling are made void, even though not punishable criminally.

When the Legislature of the State refrained from tainting the friendly and sociable poker game with a criminal hue, and merely imposed civil penalties and disabilities on the players, can it be said that that is such an expression of our public policy as abhors the whole moral tone of the sovereign State of Florida, which does not choose so to civilly penalize the game of poker?

We can only make void the check at bar, which is a Florida contract, on the ground that the public policy of the State of Florida, in this regard, is wholly abhorrent to all civilized notions of right conduct and morality, and, therefore, to our own standards of right and wrong conduct.

While the public policy of this State is necessarily to be gleaned from the Constitution and legislative enactments thereunder (*Campbell* v. *City of N. Y.*, 244 N. Y. 317, 324), it does not necessarily follow that our public policy, differing from that of another State, will cause our courts to ban contracts made under a public policy different from our own. As to contracts relating to the remedial procedure of our courts, our policy will prevail as against any other (*Meacham* v. *Jamestown, F. & C. R. R. Co.*, 211 N. Y. 346, 352), and that is so, because we will not permit the altering or diminishing of the jurisdiction of our courts by private contracts made in other States, though there allowed. But not so as to the substantive law. Of course, where the law of another State is so contrary to our own conception of public morals that there can be no reconciliation with our own, and must remain abhorrent to us, our own policy in relation thereto will prevail over the foreign State, in our own courts of justice.

I do not find that the statutes in this State, or the decisions of our courts in relation to the subject here involved, raise such a fundamental conflict between us and Florida as to warrant our courts to make void a contract that was perfectly valid and enforcible in the place where it was made.

*Zeltner* v. *Irwin* (25 App. Div. 228), said by defendant to be not in point, was decided upon the express ground that a gaming contract, not being invalid under the laws of Pennsylvania, where it was made and consummated, was not invalid under the laws of this State. This express declaration was made in the face of the contention of counsel for defendant that the plaintiff ought not to have a recovery, because he stood in *pari delicto* with defendant. If the latter had been the ground of decision, it might be said that it was not suggestively favorable to plaintiff at bar. For the

decision could have gone upon the ground that plaintiff, having made a wager and paid it in another State, where it was lawful, our courts would not interfere, neither to aid the losing and paying party to recoup, nor to grant the unpaid winner relief, upon such a contract. Had the *Zeltner* case been decided upon these general principles, it might be said to be an expression, favorable to the defendant, of the general public policy of the courts of this State on the subject of gambling contracts good in other jurisdictions.

While the decision of *Harris* v. *White* (81 N. Y. 532) is said to be not in point here, because the court sustained the findings of fact that the contract did not contemplate that plaintiff would drive defendant's horses for a bet or wager, yet the following expressions of Chief Judge FOLGER, though it be assumed not, to have been necessary to the decision of that case and, therefore *dicta*, cannot be ignored upon the general question of our public policy in relation to suits upon gambling contracts where there is a conflict between the substantive law of the forum and that of the State where the transaction took place: " In the first place, whatever was done or agreed to be done, without the borders of this State, by the plaintiffs, is not to be deemed a violation of the statute, or against the public policy of this State. At common law all wagers were not illegal. (*Da Costa* v. *Jones*, Cowp. 729; *Good* v. *Elliott*, 3 T. R. 693; *Bunn* v. *Riker*, 4 Johns. 427.) It was not illegal, at common law, to make a bet or wager on a horse-race; and an action to recover a wager won has been maintained. (*McAllester* v. *Haden*, 2 Camp. 438; *Blaxton* v. *Pye*, 2 Wils. 309; and see *Gibbons* v. *Gouverneur*, 1 Denio, 170.) It would not have been illegal, at common law, to have offered a purse, prize or premium, that is, a reward, for the horse that excelled in speed; nor to have agreed to drive or ride a horse in a contest therefor. If the common law prevails in the other States in which by the contract the plaintiffs agreed to drive the defendant's horses, then that contract was not illegal by the law of those States, and the statute law of this State may not run over its borders into those States and with it carry thither the public policy of this State. The defendant has made no proof of what is the law of those States on this subject; he has not even pleaded that by that law this contract was illegal. (*Cutler* v. *Wright*, 22 N. Y. 472.) As a general rule, courts of one State, in the absence of proof and allegations otherwise, will presume that the laws of another State are like those of their own State. It is doubted, however, whether this presumption will be made of statute law. [*McCulloch* v. *Norwood*, 58 N. Y. 567; *Wilcox Silver Plate Co.* v. *Green*, 72 id. 17.] It will not be made of statutes imposing a penalty or forfeiture. (*Cutler*

v. *Wright, supra.*)   And it has been declared that a court cannot take notice judicially of any laws of other States not according to the common law.   (*Holmes* v. *Broughton,* 10 Wend. .75.)   To trot a horse in another State for a wager or for stakes, or for a purse, prize or premium, is not then *prima facie* illegal in that State.   To agree to drive a horse in a contest of speed in another State is not, so far as this case shows, a contracting to do an unlawful thing, nor one against the policy of this State; for the statute law and policy of this State we may not hold to be prevalent there."

While not involving the subject of playing poker for stakes, I find that the decisions of the courts of this State, upon gaming contracts, made in other jurisdictions, are either enforced or denied enforcement, according to the laws of the place where such contract was made.   (*Thatcher* v. *Morris,* 11 N. Y. 437; *Ormes* v. *Dauchy,* 82 id. 443; *Zeller* v. *Leiter,* 189 id. 361.)   And the weight of authority seems to be that in contracts arising out of gambling transactions the *lex loci contractus* will be applied, especially where the particular gaming transaction is not deemed a crime in the eyes of the law of the forum, as in the case at bar.   (27 C. J. "Gaming," § 266g, p. 1049.)

The only case cited by defendant, and squarely in point, that holds contrary to the views expressed here is *Nielsen* v. *Donnelly* (110 Misc. 266).   The decision seems to be based solely upon the principles laid down in *Meacham* v. *Jamestown, F. & C. R. R. Co.* (211 N. Y. 346), which I do not think in any way applicable at bar. I, therefore, respectfully, decline to follow the reasoning therein, not feeling that the decision has the force of authority or *stare decisis,* in this court.

There is no such rule, as contended for by defendant, that whatever kind of contract is declared void by the laws of New York, will not be enforced in our courts, though made in another jurisdiction, where its inception was valid.   Usurious contracts are void in New York.   We say interest above six per cent on loans is usurious.   Other States say that interest above six per cent is not usurious.   Yet we commonly enforce foreign contracts of that kind, if valid where made, though void if made here.   A usurious promissory note is just as void in New York as a promissory note issued for a gambling loss.   Our public policy is to regard interest over six per cent, to be paid by an individual, as unlawful.   Yet we do not impose that notion on our neighbors, if they have occasion to resort to our courts.   (*Sheldon* v. *Haxton,* 24 Hun, 196; affd., 91 N. Y. 124; *Manhattan Life Ins. Co.* v. *Johnson,* 115 App. Div. 429; affd., 188 N. Y. 108.)   Many instances may be cited of contracts that would be invalid in this State, and not

necessarily looked upon through the same glasses, when they come here for enforcement from another State, where the law is different.

New York courts never refuse to enforce contracts, valid where they were made, merely because, under similar circumstances, they would be invalid here. (*Marie* v. *Garrison,* 13 Abb. N. C. 210; *Ockerman* v. *Cross,* 54 N. Y. 29; *Nichols* v. *Mase,* 94 id. 160; *Wattson* v. *Campbell,* 38 id. 153; *Commonwealth of Kentucky* v. *Bassford,* 6 Hill, 526; *Simmons* v. *Wood,* 45 How. Pr. 262. See, also, *King* v. *Sarria,* 69 N. Y. 24.)

The phrase "public policy" is used in several senses. It may mean the common law or general statutory law of the State. It may mean our prevalent notions of justice and our general fundamental conceptions of right and wrong. It may mean both. Sometimes when the courts use the phrase, they mean all or one of these conceptions. But when it comes to applying the phrase to the laws or conceptions of justice of a sister State or foreign country, it is not to be restricted to mere differences in the law. As I understand our law, it is a far larger consideration which moves our courts, when a valid foreign contract is refused enforcement here. To be so interdicted, it must have a tendency to undermine public morals, to endanger the public health or public safety, to improperly influence judicial or legislative action, or the conduct of public officers, to unreasonably restrain marriage, or to affect some matter that may well be regarded, with a fair degree of public unanimity, as contrary to all decent notions of life, liberty or the pursuit of commerce and happiness of the people of our State. (*Dearing* v. *McKinnon Dash & Hardware Co.,* 165 N. Y. 78, 86.)

As Judge CARDOZO puts it in *Loucks* v. *Standard Oil Co.* (224 N. Y. 99, 111): "The courts are not free to refuse to enforce a foreign right at the pleasure of the judges, to suit the individual notion of expediency or fairness. They do not close their doors unless help would violate some fundamental principle of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal." And again. "There is a growing conviction that only exceptional circumstances should lead one of the states to refuse to enforce a right acquired in another." Those exceptional circumstances are not merely differences in statutes, absence or presence of similar statutes, or even conflicting statutes. Those exceptional circumstances depend upon the general considerations, which the game of poker, as played by the parties here, cannot be said, in the greatly preponderant judgment of mankind and of the people of the State, to offend. I do not think that because the State of Florida permits those who sojourn there to play poker for money sociably and privately, be the stakes

high or low, and permits unpaid successful players to recover their winnings in her courts of law, we can regard her theory of individual liberty and government so obnoxious to our own as to refuse her laws on the subject enforcement here. Judgment is, therefore, directed for plaintiff. Submit findings.